IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

J.M., by and through his          )    CIVIL 15-00405 LEK-KJM
Mother, MARIA MANDEVILLE,         )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )
                                  )
DEPARTMENT OF EDUCATION,          )
STATE OF HAWAI`I, and KATHRYN     )
MATAYOSHI, superintendent of      )
the Hawaii Public Schools,        )
                                  )
          Defendants.             )
_____

**ORDER AFFIRMING THE HEARINGS OFFICER'S SEPTEMBER 9, 2015**
**FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION;**
**AND GRANTING PLAINTIFFS' REQUEST FOR STAY-PUT RELIEF**

On October 6, 2015, Plaintiffs J.M. ("Student"), by and

through his Mother, Maria M. ("Mother," collectively "Plaintiffs"

or "Petitioners"), filed an appeal of the Administrative Hearings

Officer's ("Hearings Officer") September 9, 2015 Findings of

Fact, Conclusions of Law and Decision ("2015 Decision").[1]

[Complaint (dkt. no. 1).]  Plaintiffs filed their First Amended

Complaint on December 22, 2015.  [Dkt. no. 11.]  Plaintiffs filed

their Opening Brief on July 25, 2016.  [Dkt. no. 35.] Defendants

Department of Education, State of Hawai`i and Kathryn Matayoshi,

Superintendent of the Hawai`i Public Schools (collectively,

"Defendants," "the DOE" or "Respondents"), filed their Answering

_____

[1] The 2015 Decision is part of the Administrative Record on
Appeal, transmitted on October 27, 2015 ("AR"), at 299-326.

Brief on August 26, 2016, and Plaintiffs filed their Reply Brief on September 12, 2016.  [Dkt. nos. 39, 41.]  The Court heard oral argument in this matter on October 11, 2016.  After careful consideration of the briefs, record, arguments of counsel, and relevant legal authority, this Court HEREBY AFFIRMS the 2015 Decision, but GRANTS Plaintiffs' request for stay-put relief pursuant to 20 U.S.C. § 1415(j).

## BACKGROUND

Student was born in 2003, and he is eligible for special education services under the category of Autism Spectrum Disorder ("ASD").  [2015 Decision at 3.]  The Hearings Officer found that "Student has sensory issues and social concerns representative of a child on the Autism Spectrum that require accommodations and specially designed instruction in social skills."  [Id.]  Student attended his Home School from kindergarten.  [Id. at 3.]  The Hearings Officer found that, at the Home School, "Student was bullied by other students on several occasions even though he had counseling and a one-to-one (1:1) aide with him at all times."  [Id.]  In March 2013, Mother unilaterally removed Student from the Home School, and he began attending an autism center ("Private School").  [Id.]

An October 24, 2014 Findings of Fact, Conclusions of Law, and Decision ("2014 Decision")[2] found that Student's November 7, 2013 Individualized Education Program ("11/7/13 IEP") denied him a free appropriate public education ("FAPE") because "Student was the victim of bullying at the Home School and his learning opportunities were substantially restricted." [2015 Decision at 3.]  The Hearings Officer in the 2014 Decision found that Student's placement at the Private School was appropriate and awarded Plaintiffs reimbursement.  [Id.]

On November 24, 2014, the Home School held an IEP team meeting for Student and formulated an IEP ("11/24/14 IEP").  [Id. at 4; AR, Respondents' Exhs. at 11-26 (11/24/14 IEP).]  The IEP team reviewed: the 11/7/13 IEP; the Home School special education teacher's ("SPED Teacher") observations of Student at the Private School on November 5, 2014; information obtained on November 5, 2014 from Student's Private School skills trainer; progress reports from the Private School dated November 5; samples of Student's work on November 5; the behavioral health specialist's ("BHS") observations of Student on November 5; the occupational therapist's ("OT") observations of Student at the Private School

---

[2] The 2014 Decision is part of the AR at pages 110-54, as Exhibit A to Plaintiffs' Memorandum in Opposition to the Department's Motion for Partial Dismissal or in the Alternative for Partial Summary Judgment.  The same Hearings Officer issued both decisions.  [2014 Decision at 45; 2015 Decision at 27.]

on November 21, 2014; and input from the IEP team members.  [2015

Decision at 5.]  During the SPED Teacher's observation of

Student, she saw Student try to converse with another student,

who was younger.  "The other student had difficulty communicating

back and forth with Student; the other student wasn't able to

answer questions and had to be prompted to engage in a

conversation."  [Id. at 4.]

> As described by the Hearings Officer:
>
> The [11/24/14] IEP provided Student with 270
> minutes per quarter of counseling, 1770 minutes
> per week of special education, and 1770 minutes of
> individualized instructional support.  He would
> receive daily: 1) role playing of situations that
> may cause anxiety; 2) seating near positive peer
> role models; 3) modified lunch and recess, as
> needed until Student felt comfortable with peers;
> 4) opportunities to interact with same-age peers;
> 5) opportunities to practice self-calming
> strategies; 6) social stories to help with his
> anxiety and peer interaction; 7) Behavior Support
> Plan ("BSP"); and 8) Crisis Plan.  He would also
> have peer mediated instruction and intervention
> (buddy program) two times per week.

[Id. at 5.]  The Hearings Officer found that, based on the Home

School Principal's and the SPED Teacher's testimony, Student

would have an adult – i.e. a 1:1 aide – with him at all times

when he returned to the Home School.  [Id.]  The 11/24/14 IEP

provided for transition services at the Home School during the

winter break, and the SPED Teacher testified about other

transition services that would be available after the break.

[Id. at 5-6.]

The DOE Psychologist testified that the Crisis Plan was developed to address, *inter alia*: any future bullying because of the prior bullying that Student experienced at the Home School; and Mother's concerns about Student's anxiety related to bullying.[3]  [Id. at 6.]  As described by the Hearings Officer:

> The Crisis Plan stated that the student "would be under close adult supervision at all times." Interactions with peers would be monitored by an adult.  The Crisis Plan listed steps to be taken "[s]hould a bullying incident occur (i.e., negative verbal and/or physical interaction, including, but not limited to: name calling, laughed at, pushed, kicked, punched, having things thrown at him, saying negative comments or statements, etc.) . . .["]

[Id. at 7.]

At the meeting, the IEP team proposed a "draft" IEP, but added the following statement in the final version to address concerns that Mother raised in a November 21, 2014 letter ("11/21/14 Letter"): "'Mother later voiced concern about a bullying incident at the Home School.'"  [Id. at 8; 11/24/14 IEP at 2.]

In November 2014, Student began seeing a private counselor once a week for his anxieties.  Student's Grandfather, who is Student's primary caretaker, testified that Student was a nervous child, who had phobias about other children, as well as

---

[3] The Crisis Plan is available in the AR, Respondents' Exhibits at pages 36-37.

the wind and rain.  However, Student's anxieties improved after
he started seeing the counselor.  [11/24/14 IEP at 3-4.]  The
Hearings Officer found that the IEP team was unaware that Student
was seeing a private counselor, and, if they had known about it,
they would have had the Home School Counselor conduct further
assessments to determine if there were other services or supports
that Student needed.  [Id. at 8-9.]

      Mother rejected the 11/24/14 IEP at the end of the
meeting, and she sent a written notice of rejection to the Home
School by facsimile on December 10, 2014.  [Id. at 9.]  The Home
School issued a Prior Written Notice of Department Action on
December 4, 2014 ("12/4/14 PWN").  It stated that Mother and the
Private School representative wanted Student to remain at the
Private School, but the Home School rejected that option because
his IEP team could provide the services necessary for a FAPE at
the Home School.  [Id.; AR, Respondents' Exhs. at 27.]  On
December 28, 2014, Mother sent another letter to the Home School
Principal rejecting the 11/24/14 IEP because of the previous
bullying incidents at the Home School ("12/28/14 Letter").  The
12/28/14 Letter stated that Student would continue to attend the
Private School and that Mother had instructed the Private School
to continue to bill the DOE pursuant to the 2014 Decision.  [2015
Decision at 9; AR, Petitioners' Exhs. at 45.]  On February 3,
2015, the DOE sent the Private School a letter stating that it

was only required to pay for Student's services received from the Private School up to the date of the 12/4/14 PWN.  [2015 Decision at 9; AR, Petitioners' Exhs. at 46.]

On February 11, 2015, the Home School sent Mother a letter through the Private School ("2/11/15 Letter") regarding the scheduling of a meeting to review the 11/24/14 IEP and to develop a plan for Student's transition services during spring break.  The 2/11/15 Letter noted that the DOE had been having difficulty contacting Mother and requested that she update her contact information as soon as possible.  [2015 Decision at 9; AR, Petitioners' Exhs. at 47.]

On February 13, 2015, Plaintiffs filed a request for a due process hearing ("Due Process Complaint").  [2015 Decision at 1; AR at 2-5 (Due Process Complaint).]  The Hearings Officer conducted the due process hearing on May 29, 2015 and June 1, 2015.  The parties also submitted post-hearing briefs.  [2015 Decision at 2; AR at 197-213, 214-82, 283-97.]

Prior to the due process hearing, on February 25, 2015, the DOE conducted a resolution session, with Mother and Plaintiffs' attorney participating by phone.  Mother agreed to work with the Home School and the intended intermediate school ("Future Home School") to develop a transition plan for the 2015-2016 school year.  The DOE offered to perform a emotional behavioral assessment of Student, but Mother did not agree to the

7

assessment.  [2015 Decision at 10.]

         The Home School made multiple attempts to hold the

transition meeting with the Future Home School, but could not

contact Mother.  Their letters were returned, and when DOE

representatives went to her home, it appeared abandoned, but she

never informed the Home School of an address change.  Mother

previously told the Home School to contact her through the

Private School, but, in May 2015, when the Home School sent

Mother a letter regarding a transition meeting on June 22, 2015,

the Private School refused to accept it on her behalf.  [Id.]

         On March 30, 2015, Mother sent the Home School

Principal a letter about one of the proposed transition meetings.

She stated that: she was concerned about the prior bullying and

whether there were sufficient protections in place to prevent

future bullying incidents; Student was thriving at the Private

School and she wanted him to remain there; and she wanted to wait

for the ruling on the Due Process Complaint before making any

arrangements for his return to the Home School or for his

attendance at the Future Home School.  [Id.; AR, Petitioners'

Exhs. at 49.]

         On May 8, 2015, the Home School Principal sent Mother a

letter through the Private School regarding holding a transition

meeting on May 21, 2015, after having previously offered six

other dates.  The Home School Principal acknowledged Mother's

concerns about bullying and stated that they could review Student's plan and make changes. [2015 Decision at 10; AR, Petitioners' Exhs. at 112.] Also on May 8, Mother wrote the Home School a letter, stating that Student had visited the grounds of the Future Home School, and he told Mother that he was not brave enough to go there. According to Mother, "Student was 'experiencing post-traumatic stress around large crowds of peers from his many years of continual bullying' at the Home School." [2015 Decision at 9-10; AR, Petitioners' Exhs. at 50.] Mother stated that Student was not ready to transition to the Future Home School, and she thought it was best to leave him at the Private School. [2015 Decision at 10; AR, Petitioners' Exhs. at 50.] Grandfather and the Private School representatives who testified before the Hearings Officer took similar positions. [2015 Decision at 12 (Clinical Director), 14 (Behavioral Intervention Specialist and Grandfather).]

The Hearings Officer made findings about the appropriateness of the Private School and Student's progress at the Private School, but those are not at issue here because Defendants have acknowledged that the 2014 Decision established that the Private School was Student's educational placement, at least up to the 12/4/14 PWN. Further, Defendants do not dispute that Student has received academic benefits at the Private School.

The DOE District Resource Teacher ("DRT") testified as an expert in special education and Applied Behavioral Analysis ("ABA").  The DRT observed Student at the Private School in the fall of 2013 and wanted to observe Student again prior to the due process hearing, but the Private School did not grant the DRT permission to do so.  [Id. at 14.]

> 79.  The DRT recommended that Student have a "desensitization program," starting off with Student being in a situation of safety and comfort and slowly introducing new elements such as typically developing peers.  The peers would be trained to understand how to react to Student, and they would participate in activities that Student particularly enjoyed.  Once he developed a positive attitude and a feeling of safety in the new situations, the number of peers, activities, and locations would be expanded. . . .

[Id. at 14-15.]  According to the DRT, the Future Home School could facilitate such a program, but the Private School could not because of its small size.  The Private School's size "does not provide Student with opportunities to help desensitize him to his anxiety in large groups."  [Id. at 15 (citing TR 208:6-209:21).]

The Hearings Officer concluded that the 11/24/14 IEP was tailored to fit Student's unique needs and to provide him with educational benefits.  In particular, the Hearings Officer noted that the 11/24/14 IEP provided Student with a 1:1 at all times to prevent bullying.  The Hearings Officer found that: "[i]f the 1:1 needed a bathroom break, the supervising teacher or other paraprofessional would provide coverage.  If the 1:1 was

10

absent, the Home School would either obtain a substitute or rotate current staff to provide the support.  Student would never be left alone." [Id. at 18.]  The Hearings Officer also emphasized the fact that the 11/24/14 IEP provided a transition plan during winter break, and the SPED Teacher testified she would implement additional transition support services when school started.  Further, the IEP provided for 270 minutes per quarter of counseling to help Student with his anxieties.  [Id. at 18-19.]  The Hearings Officer also emphasized that the Home School tried to engage Mother to participate in the transition plan meeting to address her concerns about bullying, but Mother did not respond.  [Id. at 19.]

As to the Crisis Plan, Plaintiffs' position was that the team should have followed the United States Department of Education, Office for Civil Right's ("OCR") October 21, 2014 Dear Colleague Letter: Responding to Bullying of Students with Disabilities ("10/21/14 Dear Colleague Letter").  [Id. at 20; AR, Petitioners' Exhs. at 72-84 (10/21/14 Dear Colleague Letter).]

Mother apparently argued that, to address the prior bullying incidents, the Home School should have implemented the components of the resolution agreements described in the 10/21/14 Dear Colleague Letter.  The Hearings Officer described those components as follows:

> 1) ensure that FAPE is provided; 2) offer the
> Student counseling; 3) monitor whether bullying
> persists and take corrective action; 4) develop
> and implement a school-wide bullying prevention
> program; 5) devise a voluntary school climate
> survey for students and parents to assess the
> presence and effect of bullying; 6) revise the
> response to bullying and develop staff protocols
> to improve the response; 7) train staff and
> volunteers; and 8) provide continuing education to
> students on the anti-bullying policies, including
> where to get help.

[2015 Decision at 20-21.] The Hearings Officer recognized that these were valid responses to bullying and that schools **could** implement them, but the Hearings Officer concluded that the 10/21/14 Dear Colleague Letter did not **require** schools to do so. [Id.]

Moreover, the Hearings Officer found that the Home School implemented most of the suggestions – in particular, by providing Student with counseling and a 1:1 aide. The Hearings Officer acknowledged that the Home School did not have a formal anti-bullying policy, but noted that the Home School "follows the disciplinary procedures set forth in [Haw. Admin. R.] Chapter 19, and the teachers and staff are trained in these procedures." [Id. at 21.] The Home School had also held various anti-bullying events, and the Future Home School participates in anti-bullying programs and has "a classroom peer/buddy system for special education students." [Id.] Thus, the Hearings Officer concluded that, even if the DOE was required to follow the 10/21/14 Dear

Colleague Letter, "the Home School has substantially complied with its recommendations" and it "has taken several preventative measures to protect Student, as well as the entire student body, from bullying." [Id. at 21-22.]

At the due process hearing, Plaintiffs argued, *inter alia*, that: 1) Defendants failed to acknowledge that Student previously suffered harm due to the Home School's deliberate indifference to Student's rights; and 2) without such acknowledgment, there was no reason for Plaintiffs to believe that the Home School made sufficient changes to prevent harm to Student if he returned there. In response to these arguments, the Hearings Officer pointed out that: the IEP team developed the Crisis Plan to address Mother's concerns about bullying; the Private School's October 29, 2014 progress report indicated that Student's emotional outbursts were infrequent and his management of his anxiety had improved; the IEP team was unaware that Student was seeing a private counselor and, if it had been aware, the Home School Counselor would have conducted further assessments to determine whether additional services or supports were necessary; and Mother did not inform the team during the November 24, 2014 meeting either that Student was experiencing on-going harm from the prior bullying incidents or that he was seeing a private counselor. [Id. at 22-23.] After Mother informed the team about the on-going harm, the Home School

13

offered to conduct an emotional behavioral assessment, but it could not do so because Mother would not consent to the evaluation.  [Id. at 23 (citing 20 U.S.C. § 1414).]  The Hearings Officer stated that the DOE did not become aware that Student was experiencing anxiety in large groups of non-disabled peers until it was provided with a May 8, 2015 progress report from the Private School.  The Hearings Officer concluded that the DOE "cannot be expected to address behavioral needed [sic] that it does not know exists," and that the 11/24/14 IEP and the Crisis Plan were drafted "with the input provided by the entire team and the information they had at the time."  [Id.]  The Hearings Officer observed that Mother, the Private School representative, and Plaintiffs' expert witness were in the best position to provide information about Student's anxieties, but they chose not to do so.  [Id.]

The Hearings Officer concluded that, while the 11/24/14 IEP did not expressly state that Student had been bullied in the past, the IEP team clearly acknowledged this because the IEP provided "counseling, 1:1 aide, transition plan, buddy program, [and] Crisis Plan."  [Id.]  He also noted that the final version of the 11/24/14 IEP included a statement in the background section about Mother's concern about bullying at the Home School. The SPED Teacher testified that this statement was added in response to the concerns raised in Mother's 11/21/14 Letter.

14

[Id.]  Thus, the Hearings Officer found that "the DOE adequately acknowledged that Student had been a victim of previous bullying," and concluded that it "offered Student programs and services in the November 24, 2014 IEP and Crisis Plan to specifically address this issue." [Id. at 24.]  The Hearings Officer concluded that the 11/24/14 IEP offered Student a FAPE at the Home School, and therefore the offered placement at the Home School was appropriate. [Id. at 25.]

The Hearings Officer found that: the 2014 Decision established Student's placement as the Private School; the 12/4/14 PWN changed his placement to the Home School; and Mother "unilaterally continued to place Student at the private school." [Id. at 24.]  However, the Hearings Officer acknowledged that Plaintiffs exercised their rights to challenge the placement at the Home School by filing the Due Process Complaint. [Id. at 25.]  The Hearings Officer concluded that, because Mother made a unilateral decision to continue to place Student at the Private School, she ran the risk that retroactive reimbursement would be denied.  Because Plaintiffs failed to prove that the 11/24/14 IEP either procedurally or substantively violated the IDEA and failed to offer Student a FAPE, Plaintiffs were not entitled to reimbursement for Student's attendance at the Private School. [Id. at 26.]

The instant appeal followed.  Plaintiffs allege that the 11/24/14 IEP failed to offer Student a FAPE because: 1) the IEP team refused to discuss Mother's concerns about the prior bullying incidents at the Home School; 2) the 11/24/14 IEP failed to address the prior bullying incidents; 3) it called for placement at the Home School even though the school failed to comply with the 10/21/14 Dear Colleague Letter; 4) the IEP, including the Crisis Plan, failed to include sufficient protections to address the risk of future bullying; 5) it failed to address the on-going harm that Student was still suffering from the prior bullying incidents; and 6) it failed to include an adequate transition plan.

### STANDARD

This Court has examined what constitutes a FAPE, and what is required in reviewing an administrative decision under the IDEA:

> The IDEA defines FAPE as:
>
> special education and related services that –
>
> (A)  have been provided at public expense, under public supervision and direction, and without charge;
>
> (B)  meet the standards of the State educational agency;
>
> (C)  include an appropriate preschool, elementary school, or secondary school education in the State involved; and

> (D) are provided in conformity with the
> individualized education program required
> under section 1414(d) of this title.

[20 U.S.C.] § 1401(9). To provide FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP. See generally 20 U.S.C. § 1414.

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(c), which provides:

> In any action brought under this paragraph, the court –
>
> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that "due weight" be given to the administrative proceedings. L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009) (some citations omitted) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)).[4] The amount of deference accorded is subject to the court's discretion. J.W. [ex rel. J.E.W. v. Fresno Unified Sch. Dist.], 626 F.3d [431,] 438 [(9th Cir. 2010)] (citation omitted). In reaching that determination, the court should consider the

---

[4] Rowley was superseded by statute on other grounds, as recognized in N.B. v. Hellgate Elementary School District, 541 F.3d 1202, 1213 n.3 (9th Cir. 2008).

thoroughness of the hearings officer's findings,
increasing the degree of deference where said
findings are "thorough and careful." L.M., 556
F.3d at 908 (quoting Capistrano Unified Sch. Dist.
v. Wartenberg ex rel. Wartenberg, 59 F.3d 884, 892
(9th Cir. 1995)).  "Substantial weight" should be
given to the hearings officer's decision when it
"evinces his careful, impartial consideration of
all the evidence and demonstrates his sensitivity
to the complexity of the issues presented." Cnty.
of San Diego v. Cal. Special Educ. Hearing Office,
93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation
and quotation marks omitted)).  Such deference is
appropriate because, "if the district court tried
the case anew, the work of the hearings officer
would not receive 'due weight,' and would be
largely wasted." Wartenberg, 59 F.3d at 891.

N.B. v. Hawai`i, Civil No. 13-00439 LEK-BMK, 2014 WL 3663452, at

*2-3 (D. Hawai`i July 21, 2014) (some alterations in N.B.).  The

Ninth Circuit has stated:

When analyzing whether an agency provided a
student a FAPE, we conduct a two-part inquiry.
First, we consider whether "the State complied
with the procedures set forth in the Act."
Amanda J. [ex rel. Annette J. v. Clark Cty. Sch.
Dist.], 267 F.3d [877,] 890 [(9th Cir. 2001)]
(quoting [Bd. of Educ. v.] Rowley, 458 U.S. [176,]
206-07, 102 S. Ct. 3034) (internal quotation marks
omitted).  Second, we must determine whether the
IEP is "rationally calculated to enable the child
to receive educational benefits." Id.  A state
must meet both requirements to comply with the
obligations of the IDEA.  Rowley, 458 U.S. at 207,
102 S. Ct. 3034.

    Harmless procedural errors do not constitute
a denial of FAPE.  L.M. v. Capistrano Unified Sch.
Dist., 556 F.3d 900, 910 (9th Cir. 2008).
"'However, procedural inadequacies that result in
the loss of educational opportunity, or seriously
infringe the parents' opportunity to participate
in the IEP formulation process, clearly result in
the denial of FAPE.'" Shapiro [ex rel. Shapiro v.

18

> *Paradise Valley Unified Sch. Dist.*, 317 F.3d
> [1072,] 1079 [(9th Cir. 2003)] (quoting *W.G. v.
> Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960
> F.2d 1479, 1484 (9th Cir. 1992)).[5]  Where a
> court identifies a procedural violation that
> denied a student a FAPE, the court need not
> address the second prong.  *Id.*

*Doug C. v. Haw. Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir.

2013) (footnote omitted).[6]  As to the second part of the inquiry,

the Ninth Circuit has stated:

> The School District must offer the Student a
> placement that is tailored to the Student's unique
> needs.  *See Gregory K. [v. Longview Sch. Dist.]*,
> 811 F.2d [1307,] 1314 [(9th Cir. 1987)].
> Additionally, the placement must be in the least

---

[5] *Shapiro* and *Target Range* were superseded by statute on other grounds, as recognized in *M.L. v. Federal Way School District*, 394 F.3d 634, 653 (9th Cir. 2005).

[6] The Ninth Circuit noted:

> Hawaii has fully implemented the purposes,
> guarantees, and protections of the IDEA into its
> own regulatory structure.  *See* Haw. Code R. §§ 8-
> 60-1 to 8-60-84; *see also* § 8-60-1(b) ("This
> chapter shall be construed as supplemental to, and
> in the context of, the Individuals with
> Disabilities Education Act . . . and other federal
> laws and regulations relating to the provision of
> a free appropriate public education to a student
> with a disability.").  Hawaii's regulations mirror
> the language in the IDEA regarding the IDEA's
> purposes, the guarantee of a FAPE, and the
> requirement of parent participation.  *Compare* Haw.
> [Admin.] R. § 8-60-1 (purposes), *with* 34 C.F.R.
> § 300.1 (same); Haw. [Admin.] R. § 8-60-3
> (guarantee of FAPE), *with* 34 C.F.R. § 300.101
> (same); Haw. [Admin.] R. § 8-60-46 (parent
> participation), *with* 34 C.F.R. § 300.322 (same).

*Doug C.*, 720 F.3d at 1043 n.4 (alterations in *Doug C.*).

> restrictive environment — in other words, the
> Student must be placed with non-disabled peers "to
> the maximum extent appropriate."  34 C.F.R.
> § 300.114; 20 U.S.C. § 1412(a)(5)(A). . . .

A.R. ex rel. Reese v. Santa Monica Malibu Sch. Dist., 636 F.

App'x 385, 386 (9th Cir. 2016).

> The burden of proof in IDEA appeal
> proceedings is on the party challenging the
> administrative ruling.  Hood v. Encinitas Union
> Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)
> (citations omitted).  The challenging party must
> show, by a preponderance of the evidence, that the
> hearing decision should be reversed.  J.W., 626
> F.3d at 438 (citation omitted).

N.B., 2014 WL 3663452, at *3.

## **DISCUSSION**

At the outset, this Court acknowledges that some of the

Hearings Officer's findings and conclusions are open to

interpretation and that there are a some minor errors, such as

attributing one witness's statement to another witness.  However,

read as a whole, this Court FINDS that the 2015 Decision is

thorough, careful, and well-reasoned.  The 2015 Decision is

supported by appropriate evidence and demonstrates that the

Hearings Officer considered all of the evidence and the complex

issues presented.  Accordingly, the Court gives "substantial

weight" to the 2015 Decision.  See Cty. of San Diego, 93 F.3d at

1466-67.  This Court now turns to the merits of Plaintiffs'

appeal.

## I.  __Failure to Discuss Bullying at the Meeting__

Plaintiffs allege that, at the November 24, 2014 IEP meeting, the team refused to discuss the 2014 Decision and the prior bullying incidents.  They allege that this was a procedural denial of FAPE because the team's refusal to discuss the issues that Mother raised violated her right to participate in the formulation of Student's IEP.

The Due Process Complaint alleged the following denials of FAPE.  First, the November 24, 2014 IEP and Crisis Plan did not address how the DOE changed or implemented policies in response to the bullying incidents that Student suffered.  The IEP and Crisis Plan focus on how the DOE will respond if there is an incident of bullying, and they fail to specify how future bullying will be prevented.  Second, the DOE has not acknowledged that Student was harmed.  Third, Student should not be required to return to the environment where he was harmed.  [Due Process Complaint at 3.]  Fourth, the DOE refused to agree to placement at private school.  [Id. at 4.]

This Court has stated:

> As a general rule, arguments not raised at an
> administrative hearing cannot be raised for the
> first time on appeal to the district court.  The
> Ninth Circuit applied this rule to IDEA appeals in
> Robb v. Bethel School District No. 403, where it
> held that, "when a plaintiff has alleged injuries
> that could be redressed to any degree by the
> IDEA's administrative procedures and remedies,
> exhaustion of those remedies is required."  308

F.3d 1047, 1048 (9th Cir. 2002).[7]   Exhaustion
may be avoided, however, if "it would be futile or
offer inadequate relief, or if the agency has
adopted a policy or pursued a practice of general
applicability that is contrary to the law." <u>N.D.
v. Hawaii Dep't of Educ.</u>, 600 F.3d 1104, 1110 (9th
Cir. 2010) (citations and internal quotation marks
omitted). . . .

    The Ninth Circuit has also held that review
in IDEA cases is specifically limited to the
issues raised in the administrative complaint.
<u>Cnty. of San Diego v. Cal. Special Educ. Hearing
Office</u>, 93 F.3d 1458, 1465 (9th Cir. 1996) ("The
scope of the administrative hearing mandated by
[former] section 1415(b)(2) is limited to the
'complaint' raised to obtain the hearing.").  20
U.S.C. § 1415 codified this holding, providing
that "[t]he party requesting the due process
hearing shall not be allowed to raise issues at
the due process hearing that were not raised in
the notice filed under subsection (b)(7), unless
the other party agrees otherwise."
§ 1415(f)(3)(B).

<u>James M. ex rel. Sherry M. v. Hawai`i</u>, 803 F. Supp. 2d 1150,

1164–65 (D. Hawai`i 2011) (alterations in <u>James M.</u>) (footnote

omitted).

    Concern for the safety and well-being of one's child is

far and away a parent's greatest priority.  Mother's concerns

about the prior bullying incidents and fears for her child if he

---

    [7] <u>Robb</u> was overruled by <u>Payne v. Peninsula School District</u>,
653 F.3d 863 (9th Cir. 2011), which was overruled on other
grounds by <u>Albino v. Baca</u>, 747 F.3d 1162 (9th Cir. 2014).
However, in <u>Payne</u> the Ninth Circuit merely "'clarified that the
IDEA's exhaustion provision applies only in cases where the
relief sought is available under the IDEA.'"  <u>M.M. v. Lafayette
Sch. Dist.</u>, 767 F.3d 842, 861 (9th Cir. 2014) (quoting <u>Payne</u>, 653
F.3d at 871).

returned to the Home School are understandable, and she has the Court's sympathy.  However, certain rules must be followed in challenges such as the instant appeal.

Because Plaintiffs failed to allege the procedural denial of FAPE in their Due Process Complaint, this Court CONCLUDES that they did not exhaust their administrative remedies as to this argument.  Further, this Court CONCLUDES that none of the exceptions to the exhaustion requirement apply.  This Court therefore DENIES Plaintiffs' appeal as to their argument alleging a procedural denial of FAPE based on the IEP team's alleged failure to discuss the prior bullying incidents.

## II.  <u>Failure to Address Past Bullying in the IEP</u>

Plaintiffs also argue that the 11/24/14 IEP failed to offer Student a FAPE because it failed to address the prior bullying incidents.  This issue is related to the issue of whether the IEP included sufficient services and supports to address the risk of future bullying.  However, this issue raises the question whether – regardless of the services and supports offered – the failure of the 11/24/14 IEP to acknowledge the severity of, and the DOE's responsibility for, the prior bullying incidents resulted in the failure to offer a FAPE.

The 2014 Decision – which the Hearings Officer issued on October 29, 2014 – concluded that Student's 11/6/13 IEP denied Student a FAPE because: "1) Student was a victim of bullying;

23

2) the school authorities were aware of multiple bullying incidents; 3) the school failed to take the appropriate steps to notify the parents, investigate the incidents, or take remedial action; and 4) Student's learning opportunities were 'substantially restricted' due to the bullying." [2014 Decision at 35.]  In spite of the findings and conclusions in the 2014 Decision, the Background Information of the 11/24/14 IEP merely states that Student attended the Home School "through the first semester of the 3rd grade" when Mother "unilaterally removed" him. [11/24/14 IEP at 2.]  It also states that Mother "later voiced a concern regarding **possible bullying** which . . . occurred," and she "subsequently enrolled him at" the Private School. [Id. (emphasis added).]  The Parent Concerns section states that Mother requested that: the IEP team review the 2014 Decision; the team "discuss complaints raised in her earlier letters in regards to bullying"; and the IEP reflect the 2014 Decision's ruling on Student's placement. [Id. at 4.]  There is no other discussion in the 11/24/14 IEP of the prior bullying incidents.

During the oral argument before this Court, Defendants' counsel acknowledged that the 11/24/14 IEP could have more directly addressed the prior bullying incidents.  This Court is troubled by the fact that the 11/24/14 IEP appears to both minimize the seriousness of the prior bullying incidents and

24

ignore the DOE's responsibility for the incidents.  This Court
also agrees with Plaintiffs that Student's IEP needs to alert
school staff to the fact that bullying is a greater concern with
Student than it is with others, and underscores this point here
to emphasize its importance as well as to suggest firmly that
including such information would be the better and wiser
practice.

 Although it failed to present a complete picture of the
prior bullying that Student suffered, the minimal discussion of
prior bullying in the 11/24/14 IEP and the fact that the IEP
incorporated a Crisis Plan[8] did alert school staff to the
heightened concern about Student being bullied.  There are no
magic words that were required to be included in the 11/24/14 IEP
to constitute a sufficient discussion of the prior bullying
incidents.  Instead, the critical inquiry for the issue of
whether the 11/24/14 IEP offered Student a FAPE at the Home
School is whether the services and supports offered were
rationally calculated to enable Student to receive educational
benefits.  That issue is addressed *infra*.

 Thus, to the extent that Plaintiffs contend that the
11/24/14 IEP's failure to adequately discuss the prior bullying
incidents – in and of itself – resulted in a failure to offer

---

[8] Plaintiffs acknowledge that a Crisis Plan is not a
standard component of every student's IEP.

Student a FAPE, Plaintiffs' appeal is DENIED.

## III. <u>10/21/14 Dear Colleague Letter</u>

Plaintiffs next argue that the 11/24/14 IEP failed to offer Student a FAPE because it called for placement at the Home School, even though the school failed to comply with the 10/21/14 Dear Colleague Letter after the 2014 Decision.  Plaintiffs argue that, to address the prior bullying incidents, the Home School should have implemented the components of the resolution agreements described in the 10/21/14 Dear Colleague Letter, summarized in the 2015 Decision at pages 20-21.  This discussion of resolution agreements appears in a section setting forth "hypothetical examples [that] illustrate how OCR would analyze a complaint involving allegations of the bullying of a student with a disability who only receives Section 504 FAPE services." [10/21/14 Dear Colleague Letter at 9.]  In an example of a situation involving disability-based harassment and a FAPE violation, the OCR stated: "If, upon concluding its investigation, OCR and the district were to enter into a resolution agreement, OCR **could require, for example** . . . ." [<u>Id.</u> at 10 (emphasis added).]  Thus, the eight actions listed, and which the Hearings Officer summarized in the 2015 Decision, are merely **examples** of how bullying which results in the denial of FAPE **can** be addressed.  The eight actions are not **required**

responses for all instances when bullying results in the denial of FAPE.

This Court also notes that the Courts of Appeal have described the OCR's Dear Colleague letters as providing "guidance." <u>Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.</u>, 810 F.3d 961, 972 n.36 (5th Cir. 2016); <u>T.K. v. New York City Dep't of Educ.</u>, 810 F.3d 869, 876 (2d Cir. 2016). This Court is not aware of any Ninth Circuit case addressing what, if any, weight courts should give to the OCR's Dear Colleague letters. This Court therefore CONCLUDES that the OCR's 10/21/14 Dear Colleague Letter is merely aspirational. Because the 10/21/14 Dear Colleague Letter is merely aspirational and the responses to bullying described in the letter merely provide guidance for schools, not requirements, this Court does not reach the issue of whether the DOE substantially complied with the eight responses described in the letter.

To the extent that Plaintiffs contend that the 11/24/14 IEP failed to offer Student a FAPE because of the Home School's failure to implement the eight bullying responses listed in the 10/21/14 Dear Colleague Letter, Plaintiffs' appeal is DENIED.

## IV. Whether the 11/24/14 IEP Adequately Addressed the Risk of Future Bullying Incidents

Plaintiffs contend that the DOE failed to offer Student a FAPE because the 11/24/14 IEP, including the Crisis Plan,

27

failed to include sufficient protections to address the risk of future bullying.

The 11/24/14 IEP provided 1770 minutes per week of "Individual Instructional Support." [11/24/14 IEP at 13.]  The Crisis Plan – which is incorporated into the 11/24/14 IEP – explains: "The student will be under close adult supervision at all times.  Interactions with peers will be monitored by an adult (teacher, EA, and/or paraprofessional)." [AR, Respondents' Exhs. at 36.]  The SPED Teacher testified that the IEP team included the 1770 minutes of individual instructional support to "make sure that [Student] would always have an adult with him at all times," which she testified "would hopefully keep [bullying incidents] from happening." [AR, Trans. vol. 3 at 113-14.]  The Home School Principal testified that the Home School's policy is that,

> when there is a one-to-one paraprofessional, it
> does mean exactly that, that the child needs to be
> with a person at all times.  Should it be like a
> brief break going to the restroom, the
> paraprofessional would indicate to the supervising
> teacher or other paraprofessionals about trying to
> . . . have coverage with the child.  And that if
> the person were absent on that day, then if the
> person is from a different agency, we would try to
> get a substitute, or we would rotate our current
> staff to make sure that the students who have the
> highest needs being one-to-one have the
> paraprofessional support.

[Id. at 167.]  Plaintiffs argue that neither the 11/24/14 IEP nor the Crisis Plan include the explanation of a 1:1 aide that the

Home School Principal provided.  While Plaintiffs are correct
that this specific information is not included in either
document, the Home School Principal's testimony is consistent
with the contents of the 11/24/14 IEP and the Crisis Plan.  This
Court therefore construes his testimony as a mere explanation of
the services offered therein, not an after-the-fact attempt to
expand upon the services that were offered in the 11/24/14 IEP.

Plaintiffs also argue that the offer in the 11/24/14
IEP of a 1:1 aide at all times was not sufficient because the
prior bullying at the Home School occurred under the same
circumstances.  See 2015 Decision at 3 ("Student was bullied by
other students on several occasions even though he had counseling
and a one-to-one (1:1) aide with im at all times.").

The bullying that Student suffered at the Home School
was horrifying and inexcusable.  It is understandable that Mother
did not trust the Home School to protect her son and that the
services and supports offered in the 11/24/14 IEP were not
acceptable to her.  However, merely because the prior bullying
incidents occurred when Student had a 1:1 aide does not
necessarily mean that the offer of a 1:1 aide in the 11/24/14 IEP
automatically failed to offer FAPE.  First, the offer of a 1:1
aide must be viewed in the context of the IEP as a whole.

Based on the inclusion of the Crisis Plan in the
11/24/14 IEP, anyone working with Student at the Home School

29

would be on alert to the heightened possibility of future
bullying incidents.   Plaintiffs argue that the Crisis Plan is
insufficient because it merely specifies reactions to bullying
incidents if they occur and it does not require any preventative
actions by the Home School.   It is true the purpose of the Crisis
Plan "is to take immediate action in **response** to future bullying
incidents." [AR, Respondents' Exhs. at 36 (emphasis added).]
However, the Crisis Plan also recognizes that: "Students with
Autism may experience difficulty in interpreting social
interactions.   Response to bullying incidents will be the same,
whether they are actual or perceived." [Id.]   Further, the
Crisis Plan defines bullying incidents as "negative verbal and/or
physical interaction, including, but not limited to: name
calling, [being] laughed at, pushed, kicked, punched, having
things thrown at him, saying negative comments or statements,
etc." [Id. at 36-37.]   If any of those incidents – actual or
perceived – occurred, the Crisis Plan called for the following
response:

> • First, assess student safety.   Remove student
> from the situation and/or, remove all peers
> from the area.   If any physical contact
> occurs, immediately bring the student to the
> Health Room.   If he is unable to go to the
> Health Room for any reason, notify the Health
> Aide to come to the student's location.   The
> Health Aide will assess the student's
> physical state, and the student's parents
> will be contacted if any physical contact has
> occurred.

- Once the student's physical state has been assessed for safety, the student will be accompanied by the supervising adult (EA, Paraprofessional) to appropriate support staff (Behavioral Health Specialist, Counselor, and/or School Psychologist). Support staff will assess the student's social-emotional state, and debrief about the incident, as appropriate.  Support staff will prompt the student to describe how the situation made him feel using "I" statements, as previously practiced in counseling sessions.

- Support staff will then prompt the student to use the coping strategies that he has previously learned in counseling sessions (i.e., deep breathing, count to ten, take short walks, drink water or positive self-talk, etc.).

- Support staff will determine if/when it is appropriate for the student to return to class.

Following an actual or perceived bullying incident, details will be documented in the student's counseling file.  The parents will be notified of the incident . . . .

[Id. at 37.]  The services and supports in the Crisis Plan would

be triggered even where Student **perceived** he was being laughed

at, called names, or had other negative comments directed at him.

This Court FINDS that the Crisis Plan is rationally calculated to

enable Student to receive educational benefits by addressing any

possible or perceived bullying incidents and to prevent the

incidents from continuing or escalating.

In addition, this Court notes that it appears from the

record that Mother was seeking a guarantee that Student would not

be subjected to any bullying if he returned to the Home School. Although, ideally, no student would ever be subjected to bullying at school, that type of guarantee is not required to provide a FAPE. In the 2014 Decision, the Hearings Officer concluded that Student was denied a FAPE because his "learning opportunities were 'substantially restricted' due to the bullying." [2014 Decision at 35.] In other words, the 11/3/13 IEP was not rationally calculated to enable Student to receive educational benefits because it failed to address the bullying that was substantially restricting his learning.

It is understandable that Mother wanted something in the 11/24/14 IEP promising that Student would not be subjected to any bullying. But the lack of such a promise did not constitute a failure to offer FAPE. It is well-settled that a FAPE need not provide the "absolutely best" or "potential-maximizing" education. J.W., 626 F.3d at 439 (citation and internal quotation marks omitted). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." Id. at 433 (citations and quotation marks omitted). This Court CONCLUDES that the 11/24/14 IEP – including the Crisis Plan – was appropriately designed to enable Student to receive meaningful educational benefits at the Home School.

Plaintiff's appeal is therefore DENIED as to their argument that the 11/24/14 IEP failed to offer Student a FAPE

32

because it did not adequately address the risk of possible bullying if he returned to the Home School.

## V.    **Failure to Address On-going Harm**

Plaintiffs also argue that the 11/24/14 IEP failed to offer Student a FAPE because it did not address the on-going harm that he was still suffering from the prior bullying incidents.

The 11/24/14 IEP offered Student 270 minutes of counseling per quarter. [11/24/14 IEP at 13.] In the discussion of Student's emotional strengths and needs, the IEP noted that:

> His emotional outbursts are at a very low frequency. . . . When he is upset, he is able to express his feelings in a much more appropriate manner. [Student] has improved in his ability to manage his anxiety and knows how to calm himself down without excessive prompting. He is currently showing that he feels more confident about his abilities and skills.

[Id. at 3.] However, he still needed "to demonstrate consistency in managing his anxiety" and "to continue using appropriate coping skills and displaying positive self-expression." [Id.] In the discussion of Student's behavioral strengths and needs, the IEP noted that he "likes to please his teachers and peers" and "likes to be a leader of his peers" at the Private School. [Id. at 4.] But, it noted that certain events, like having to wait to be picked up after school, made him anxious and would cause "pacing, face sweating, hyperventilating." [Id.] In the discussion of Student's social strengths and needs, the IEP noted

that Student "likes to help his younger peers," but he "needs opportunities to interact with his same-age peers." [Id.]  Thus, the 11/24/14 IEP recognized that Student had needs related to his anxieties, but the IEP did not indicate that these anxieties were related to his interactions with groups of same-age peers.

Grandfather testified that Student started seeing a private counselor in November 2014 because of his phobias about, inter alia, other children. [AR, Trans. vol. 3 at 97.] The SPED Teacher testified that she did not remember either Mother or the Private School representatives informing the team that Student was seeing a counselor because of the prior bullying.  She also testified that, if the team had been so informed, it would have discussed further actions, including assessments by the Home School counselor and whether more counseling or other services should be included in the IEP. [Id. at 118-19.]  The DOE Psychologist gave similar testimony. [Id. at 151-52.]  The Hearings Officer found that:

> The DOE only became aware of Student's anxiety in large groups of non-disabled peers when they were provided with the May 8, 2015 progress report form the private school. . . .  Mother and the private school representatives participated in the November 24, 2014 IEP and this concern should have been raised to the IEP team. . . .  Mother and the private school representatives were in the best position to provide this information to the IEP team, but they chose not to disclose it. . . . The Home School drafted an IEP and Crisis Plan **with** the input provided by the entire team and the information they had at the time.

34

[2015 Decision at 23 (emphasis in original).]

          Plaintiffs do not dispute that the Home School was not
aware at the time of the November 24, 2014 meeting that Student
was seeing private counselor to address on-going harm from the
prior bullying incidents.  However, they argue that Mother did
not need to provide this information because it is common sense
that Student would still be experiencing on-going harm, and
therefore the DOE had the burden to address the on-going harm in
the 11/24/14 IEP.  Further, Plaintiffs point out that their
autism and ABA expert witness testified that, at the November 24,
2014 IEP meeting, she "spoke about . . . his anxiety related to
experiences that he had in [the Home School] as well as with his
peers."  [AR, Trans. vol. 2 at 15, 25.]  The Home School
Principal also testified that, during the meeting, the Private
School representatives stated that Student had anxieties about
"large crowds."  [AR, Trans. vol. 3 at 163.]

          The DOE representatives had limited opportunities to
observe Student at the Private School prior to the November 24,
2014 IEP meeting.  Even if the Hearings Officer erred in finding
that the Home School representatives were unaware that Student
had anxieties related to groups of same-age peers because of the
prior bullying incidents, this Court CONCLUDES that the Hearings
Officer's error was harmless.  The undisputed testimony is that,
if the Home School representatives had known about those

35

anxieties, they would have conducted further assessments to determine if more services and supports were necessary.  The Home School Principal testified that, at the February 25, 2015 resolution session, the DOE offered to conduct a emotional/behavioral assessment of Student.  Although Plaintiffs' counsel stated that they would think about it, as of the date of the due process hearing, they had never consented to the assessment.  [Id. at 177-78.]  The Hearings Officer concluded that the DOE could not proceed with the assessment without Mother's consent.  [2015 Decision at 23 (citing 20 U.S.C. § 1414).]  Thus, even if the Hearings Officer erred when he found that the Home School did not know about Students' anxieties about same-age peers at the time of the November 24, 2014 meeting, the school could not have performed further assessments without Mother's content.  Without the further assessments, no new information would have been available at the time of the meeting. This Court CONCLUDES that Plaintiffs have not shown that the error affected the Hearings Officer's ultimate conclusion that the 11/24/14 IEP, including the Crisis Plan, adequately addressed Student's unique needs based on the information available at the time of the meeting.

The Ninth Circuit has stated that: "When reviewing whether a proposed educational setting is 'appropriate,' we employ the 'snapshot' rule, which instructs us to judge an IEP

36

not in hindsight, but instead based on the information that was

reasonably available to the parties at the time of the IEP."

Baquerizo v. Garden Grove Unified Sch. Dist., 826 F.3d 1179, 1187

(9th Cir. 2016).  The snapshot rule "is not retrospective."

J.W., 626 F.3d at 439.

> Instead of asking whether the [IEP] was adequate
> in light of the [Student's] progress, the district
> court should have asked the more pertinent
> question of whether the [IEP] was appropriately
> designed and implemented so as to convey [Student]
> with a meaningful benefit.  We do not judge an
> [IEP] in hindsight; rather, we look to the [IEP's]
> goals and goal achieving methods at the time the
> plan was implemented and ask whether these methods
> were reasonably calculated to confer [Student]
> with a meaningful benefit . . .  In striving for
> "appropriateness," an IEP must take into account
> what was, and what was not, objectively reasonable
> when the snapshot was taken, that is at the time
> the IEP was drafted.

Id. (alterations in J.W.) (citation omitted).  In light of the

information that was reasonably available to the Home School at

the time the 11/24/14 IEP was drafted, this Court CONCLUDES that

the services and supports offered to address Student's anxieties

were objectively reasonable and were reasonably calculated to

confer Student with meaningful educational benefits.

This Court therefore DENIES Plaintiffs' appeal as to

their argument that the 11/24/14 IEP failed to offer Student a

FAPE because it did not adequately address the on-going harm that

he was suffering as a result of the prior bullying incidents at

the Home School.

## VI.  **Transition Plan**

Finally, Plaintiffs argue that the 11/24/14 IEP failed to offer Student a FAPE because it failed to include an adequate transition plan for his intended return to the Home School from the Private School.  20 U.S.C. § 1401(34) states:

> The term "transition services" means a coordinated set of activities for a child with a disability that—
>
> > (A)  is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
> >
> > (B)  is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
> >
> > (C)  includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

Thus, this district court has recognized that,

> while "the IDEA requires an IEP to have a statement of needed transition services in some circumstances, the statutory provision of the IDEA specifically addressing transition services does not mandate such services when a transition from private to public school takes place." L.M. v. Department of Education, 2006 WL 2331031, *16 (D.

38

> Haw. 2006) (citing <u>Bock v. Santa Cruz City
> Schools</u>, No. 95-20168, 1996 WL 539715 at *5 (N.D.
> Cal. 1996)).
>
> The IDEA does not mandate the creation of a
> specific transition plan when a student moves from
> a private placement to a public school, but in
> some cases, the knowledgeable education experts
> agree that a particular student would benefit from
> such a plan.  <u>See</u>, <u>[L.M.]</u>, 2006 WL 233103[1],
> *16. . . .

<u>B.B. ex rel. J.B. v. Haw., Dep't of Educ.</u>, 483 F. Supp. 2d 1042,

1056-57 (D. Hawai`i 2006) (alterations in <u>B.B.</u>).

In the instant case, Plaintiffs do not argue that the

11/24/14 IEP failed to offer Student a FAPE because of a lack of

a transition plan.  Such a claim would fail as a matter of law.

<u>See, e.g.</u> <u>Carrie I. ex rel. Greg I. v. Dep't of Educ.</u>, 869 F.

Supp. 2d 1125, 1241 n.16, 1243 n.17 (D. Hawai`i 2012) (noting

that a claim based on an IEP's lack of a transition plan for a

move from a private placement to a public school fails as a

matter of law).  Plaintiffs' argument is that, although the IEP

team determined that transition services were necessary, it

failed to offer him a FAPE because the services and supports

ultimately included in the 11/24/14 IEP were not sufficient to

meet Student's unique needs.

The 11/24/14 IEP states:

> [Student] does need a transition period prior to
> returning to school to prepare him for routines
> and expectations in the classroom.  Therefore he
> will receive services prior to his return to
> school in January 2015, on the school campus

during the last week of Winter Break for 2 hours
per day. . . .  [Student] will have access to
sensory regulation activities and counseling
consultation during this period.  Counseling will
consist of parent education provided for 8 hours
over this period.

[11/24/14 IEP at 14.]  The Hearings Officer found that:

> 23.  The SPED teacher testified that she
> would have Student start the school year in a
> special education classroom with approximately
> five to seven students, with his 1:1 support.  He
> would have a modified lunch in the special
> education classroom in a quiet, small group
> environment with only his 1:1 and teacher.  They
> would bring in two to three peer mediators into
> the classroom and have them play with Student at
> recess.  Once he was comfortable, Student would
> spend more time in the cafeteria.  They would have
> him start with attending the last five or ten
> minutes and gradually start to increase the time.
> The Home School would increase the amount of time
> Student would attend a class, until he became
> comfortable.

[2015 Decision at 6 (citation omitted).]

Plaintiffs argue that the Hearings Officer erred in
considering the SPED Teacher's testimony because she admitted on
cross-examination that she developed this plan – not the IEP team
– and that it was not included in the 11/24/14 IEP.  [AR,
Trans. vol. 3, at 127-29.]  It is true that these modifications
are not discussed within the context of Student's "transition
period prior to returning to school."  [11/24/14 IEP at 14.]
However, the "Supplementary Aids and Services, Program
Modifications and Supports for School Personnel" offered
included, *inter alia*: "Role playing of situations that may cause

40

anxiety . . . [a]s needed for self-regulation"; daily "Adult modeling"; daily "Seat[ing] near positive peer role models"; "Peer Mediated Instruction and Intervention" twice a week; and "Modified lunch and recess . . . [a]s needed for self-regulation." [Id. at 13.]  These program modifications and supports are similar to the transition plan that the SPED Teacher testified that she would implement upon Student's return to the Home School.  Although not labeled as part of a transition plan in the 11/24/14 IEP, these modifications and supports were intended to help Student transition from the Private School back to the Home School.  This Court FINDS that the Hearings Officer properly considered the SPED Teacher's testimony in evaluating the transition services offered in the 11/24/14 IEP.

The Hearings Officer concluded that the 11/24/14 IEP "contained a detailed transition plan to help Student return to the Home School" and that the transition plan was part of the overall offer of FAPE.  [2015 Decision at 19.]  This Court agrees and AFFIRMS the Hearings Officer's conclusion that the transition plan, and the transition modifications and supports, in the 11/24/14 IEP were tailored to meet Student's unique needs and were "rationally calculated to enable [Student] to receive educational benefits."  See Amanda J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 890 (9th Cir. 2001).

Plaintiffs also challenge the Hearings Officer's conclusion about the transition plan because they allege that the Hearings Officer improperly considered events that occurred after the formulation of the 11/24/14 IEP.  Immediately after summarizing the SPED Teacher's testimony about the transition modifications and supports, the Hearings Officer noted that the Home School had made several attempts to schedule a transition meeting with Mother.  During these attempts, the Home School Principal acknowledged Mother's concerns about Student's safety, especially regarding bullying, and stated that they could review the IEP and make changes at the transition meeting.  [2015 Decision at 19.]  Plaintiffs argue that the Hearings Officer erred in considering the attempts to schedule a transition meeting because all of the proposed meetings were after Plaintiffs filed the Due Process Complaint on February 13, 2015.[9]

This Court agrees with Plaintiffs that attempts to hold further transition meetings after the formulation of the 11/24/14 IEP are irrelevant to the issue of whether the IEP failed to offer Student a FAPE because the transition plan and services

---

[9] The Home School Principal did send Mother a letter prior to the filing of the Due Process Complaint attempting to schedule a meeting where Mother could "view the IEP, identify areas of concern, and provide input for [Student's] program" and where they could "discuss whether a transition program can be provided" during spring break.  [AR, Petitioners' Exhs. at 47 (letter dated 2/11/15).]  The letter offered four meeting dates – February 23 or 26, or March 5 or 9, 2015.  [Id.]

were inadequate.  However, although the Hearings Officer mentioned the attempts to schedule a transition meeting in the context of the discussion of the adequacy of the IEP's transition plan and services, this Court does not interpret the 2015 Decision as **relying** upon Mother's failure to respond to the scheduling attempts to support the Hearings Officer's conclusion that the transition plan and services were sufficient. Plaintiffs' argument appears to imply that Mother had no obligation to participate in further transition meetings after the filing of the Due Process Complaint.  Although that issue does not affect this Court's conclusion regarding the sufficiency of the transition plan and services in the 11/24/14 IEP, the issue is worth addressing.

Plaintiffs' Due Process Complaint sought an order recognizing the Private School "as Student's current educational placement for purposes of 'stay put'." [Due Process Complaint at 4.]  "A parent can request a due process hearing and invoke the stay-put provision when the State proposes to change the child's educational placement." N.D. v. Haw. Dep't of Educ., 600 F.3d 1104, 1114 (9th Cir. 2010) (citing 34 C.F.R. § 300.507 (2006); 34 C.F.R. § 300.503(a) (2006)).  The IDEA's stay-put provision states that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in

the then-current educational placement of the child." 20 U.S.C. § 1415(j). However, the filing of a due process complaint that invokes the stay-put provision does not excuse a parent from cooperating with the DOE in its good faith attempts to address the concerns with the IEP that the parent has identified. This Court has stated:

> The Court also notes that Loretta M. declined to participate in all subsequent IEP team meetings after the filing of the due process hearing request based on the 2004-2005 IEP, thus taking the position that the stay put provision gave her the right to refuse to work with the DOE. Other courts have rejected this same argument, and this Court does as well.
>
> C.H.'s parents also argued that the "stay put" provision gave them the right to refuse to work with the school district after they had filed their due process hearing request. [C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 71 (3d Cir. 2010).] The Third Circuit disagreed. "The stay-put provision," the court said, "was never intended to suspend or otherwise frustrate the ongoing cooperation of parents and the school district to reach an amenable resolution of a disagreement over educational services." Id. at 72.
>
> A.R. [v. Hawai`i], [Civil No. 10-00174 SOM/RLP,] 2011 WL 1230403, at *12 [(D. Hawai`i March 31, 2011)] (some citations omitted). . . . [T]his Court cannot ignore Loretta M.'s refusal to participate in the IEP process. Although Loretta M. believed that the 2004-2005 IEP did not offer a FAPE, had she participated in the formation of the three subsequent IEPs, the IEP team could possibly have formulated an IEP that did offer a FAPE and that she was satisfied with.

44

<u>Aliah K. ex rel. Loretta M. v. Hawaii, Dep't of Educ.</u>, 788 F. Supp. 2d 1176, 1193–94 (D. Hawai`i 2011) (some alterations in <u>Aliah K.</u>) (footnote and citations omitted).[10]  Similarly, in the instant case, the filing of the Due Process Complaint did not allow Mother to ignore the Home School's good faith attempts to schedule further meetings to review the 11/24/14 IEP, including the transition plan and services.

This Court therefore DENIES Plaintiffs' appeal as to their argument that the 11/24/14 IEP failed to offer Student a FAPE because it failed to offer an adequate transition plan for his return to the Home School from the Private School.

**VI.  <u>Summary and Stay-Put Relief</u>**

This Court has rejected all of Plaintiffs' challenges to the 2015 Decision, and therefore AFFIRMS the 2015 Decision. In the event that this Court affirms the 2015 Decision, Plaintiffs' First Amended Complaint seeks stay-put relief.  <u>See</u> First Amended Complaint at pgs. 5-6.

The 2014 Decision established the Private School as Student's educational placement.  In the 11/24/14 IEP, the DOE proposed to change that placement to the Home School.  Plaintiffs exercised their right to challenge the proposed change by filing

---

[10] Although the <u>Aliah K.</u> decision is an order denying a motion for a temporary restraining order and preliminary injunction, the <u>A.R.</u> decision is an order affirming the hearings officer's decision and denying "stay put" reimbursement.

the Due Process Complaint pursuant to 20 U.S.C. § 1415(f) and
Haw. Admin. R. § 8-60-70(a).  Pursuant to § 1415(j), Student is
entitled to remain in his educational placement at the time the
Due Process Complaint was filed during the pendency of all
proceedings associated with the Due Process Complaint, including
the current proceedings before this Court and any further appeals
from the judgment in this case.  See, e.g., Clovis Unified Sch.
Dist. v. Cal. Office of Admin. Hearings, 903 F.2d 635, 641 (9th
Cir. 1990) (holding that the school district "was responsible for
maintaining the [student's private] placement through the
pendency of court review proceedings").  Further, Plaintiffs are
entitled to stay-put relief during the pendency of the review
proceedings regardless of whether they prevail on the merits.
See, e.g., Sam K. ex rel. Diane C. v. Dep't of Educ., Civ. No.
12-00355 ACK-BMK, 2012 WL 3647139, at *8 (D. Hawai`i Aug. 22,
2012) (concluding that "Plaintiffs are entitled to Stay Put
regardless of whether they ultimately prevail on the merits").

     This Court therefore GRANTS Plaintiffs' request for
stay-put relief during the pendency of all judicial review
proceedings of the 2015 Decision.

## CONCLUSION

     On the basis of the foregoing, the Court HEREBY AFFIRMS
the Hearings Office's September 9, 2015 Findings of Fact,
Conclusions of Law and Decision.  However, this Court GRANTS

46

Plaintiffs' request for stay-put relief during the pendency of all judicial review proceedings of the 2015 Decision.

There being no remaining issues in this appeal, the Court DIRECTS the Clerk's Office to close this case on **December 22, 2016**, unless one of the parties files a motion for reconsideration of this Order by **December 19, 2016.**

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 1, 2016.



     /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

J.M., ET AL. VS. DEPARTMENT OF EDUCATION, STATE OF HAWAI`I, ET AL; CIVIL 15-00405 LEK-KJM; ORDER AFFIRMING THE HEARINGS OFFICER'S SEPTEMBER 9, 2015 FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION; AND GRANTING PLAINTIFFS' REQUEST FOR STAY-PUT RELIEF